# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GEORGE AUBREY,             )
       Plaintiff,           )
                       )
      v.                 )     **Civ. Action No. 07-0137**
                       )
DONALD SANDERS, M.D.,    )     **Judge Nora Barry Fischer**
CENTER FOR CLINICAL RESEARCH, )
INC., ROBERT GALE MARTIN, M.D., )
and CAROLINA EYE ASSOCIATES, P.C., )
       Defendants.      )

## MEMORANDUM OPINION

## I.     INTRODUCTION

Plaintiff George Aubrey (hereinafter "Plaintiff" or "Aubrey") filed the instant civil action against Defendants Robert Gale Martin, M.D. (hereinafter "Dr. Martin"),[1] Carolina Eye Associates, P.C. (hereinafter "CEA"), Donald Sanders, M.D. (hereinafter "Dr. Sanders"), and Center for Clinical Research, Inc. (hereinafter "CCR"), alleging fraudulent misrepresentation against each Defendant separately and civil conspiracy against all Defendants collectively. Pending before this Court are Motions for Summary Judgment by Defendants (Docket Nos. 44, 47).

## II.     FACTUAL BACKGROUND

### A.  LOCAL RULE 56.1 VIOLATION

---

[1] Dr. Martin died on March 18, 2008, subsequent to the filing of this lawsuit. (Docket No. 54). Dr. Martin's son, Robert Mitchell Martin, qualified as Personal Representative of the Estate of Dr. Martin on March 28, 2008. *Id.*

At the outset, the Court notes Plaintiff's violation of Rule 56.1(c) of the Local Rules of this Court ("L.R. 56.1(c)").[2] In support of their Motion for Summary Judgment, Dr. Sanders and CCR (hereinafter referred to collectively as "Sanders Defendants") submitted a Statement of Undisputed Material Facts (Docket No. 49). Similarly, Dr. Martin and CEA (hereinafter referred to collectively as "Martin Defendants") filed a Statement of Undisputed Material Facts in support of their Motion for Summary Judgment. (Docket No. 45). In response, Plaintiff filed a Counter Statement of Facts. (Docket No. 52). In his Counter Statement of Facts, Plaintiff neither admitted nor denied the facts set forth by Defendants in their respective Statements of Material Facts; rather, Plaintiff responded by asserting twenty-one additional averments, derived mostly from the

---

[2]

      Rule 56.1(C)(1) of the Local Rules of the United States District Court for the Western District of Pennsylvania mandates that the opposing response to a motion for summary judgment include:

> A separately filed concise statement, which responds to each numbered paragraph in the moving party's Concise Statement of Material Facts by:
>
>     (a)    admitting or denying whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material;
>
>     (b)    setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety (as to whether it is undisputed or material), with appropriate reference to the record (*See* L.R. 56.1(B)(1) for instructions regarding format and annotation); *and*
>
>     (c)    setting forth in separately numbered paragraphs any other material facts that are allegedly at issue, and/or that the opposing party asserts are necessary for the court to determine the motion for summary judgment[.]

W.D. Pa. L.R. 56.1(C)(1) (2008) (emphasis added).

Deposition of Davis Brown, M.D. (Docket No. 52). Local Rule 56.1(E) ("L.R. 56.1(E)") sets

forth the consequences for failure to comply with L.R. 56.1(c) as follows:

> Alleged material facts set forth in the moving party's Concise Statement
> of Material Facts or in the opposing party's Responsive Concise
> Statement, which are claimed to be undisputed, will for the purposes of
> deciding the motion for summary judgment be deemed admitted unless
> specifically denied or otherwise controverted by a separate concise
> statement of the opposing party.

W.D.Pa. L. R. 56.1E (2008). Thus, for the purposes of the instant motions, the facts, as set forth

in the Sanders Defendants' Statement of Material Facts (Docket No. 49) and those asserted in the

Martin Defendants' Statement of Material Facts (Docket No. 45) are deemed admitted by

Plaintiff, in accordance with L.R. 56.1(E). *See Jankowski v. Demand,* Civ. Action No. 06-00618,

2008 WL 1901347, at *1 (W.D.Pa. April 25, 2008); *GNC Franchising LLC v. Kahn,* Civ. Action

Nos. 05-1341; 06-00238, 2008 WL 612749, at *1 (W.D.Pa. Mar. 3, 2008); *Ferace v. Hawley*,

Civ. Action No. 05-1259, 2007 WL 2823477, at *1 (W.D.Pa. Sept. 26, 2007) (citing *Benko v.*

*Portage Area School Dist.*, Civ. Action No. 03-233J, 2006 WL 1698317 (W.D.Pa. June 19,

2006); *Smith v. Burrows Corp.*, Civ. Action No. 00-1972, 2005 WL 2106594 (W.D.Pa. Aug. 31,

2005); *Loving v. Borough of East McKeesport*, Civ. Action No. 02- 1727, 2005 WL 3560661

(W.D.Pa. Dec. 29, 2005). After careful consideration and for the reasons that follow, the Court

grants Defendants' Motions for Summary Judgment.

### B. UNDISPUTED FACTS[3]

---

[3]

Given Plaintiff's failure to respond appropriately to the Statements of Fact filed
by Defendants, the facts asserted by the Sanders Defendants and the Martin Defendants
are deemed admitted and are relied upon by this Court in making its rulings.

Sunrise Technologies International, Inc. (hereinafter "Sunrise") was a corporation located in California that developed, manufactured, and marketed laser systems for application in ophthalmology.[4] (Docket No. 49 at ¶ 4). Utilizing Laser Thermal Keroplasty ("LTK") technology, Sunrise developed an ophthalmologic laser instrument called the "Sun 1000," which later, with labeling refinements, evolved into the "Hyperion LTK." (Docket No. 45 at ¶¶ 1, 16; Docket No. 49 at ¶ 18). These instruments were intended to be used by eye doctors to correct hyperopia, known more commonly as "farsightedness." (Docket No. 45 at ¶1; Docket No. 49 at ¶ 6).

In or about 1997, Sunrise hired Dr. Sanders, the president and sole shareholder of CCR, to act as a consultant to Sunrise and assist in obtaining approval of the Sun 1000 from the Food and Drug Administration ("FDA"). (Docket No. 49 at ¶¶ 2,7). Dr. Sanders was responsible for setting up clinical trials to test the efficacy of the Sun 1000 in correcting farsightedness and presenting the data obtained from the clinical trials to the FDA. (Docket No. 49 at ¶¶ 7-8). The Sanders Defendants did not conduct clinical trials themselves. (Docket No. 49 at ¶ 9). Rather, they assisted Sunrise in setting up the trials and hiring eleven investigators to participate in the clinical studies of the Sun 1000. (Docket No. 49 at ¶ 8). Additionally, the Sanders Defendants did not create or collect data from those clinical trials. (Docket No. 49 at ¶ 9). The data from the clinical trials was collected and complied by a third-party, Bio-Reg Associates, Inc. ("Bio-Reg"), and then transmitted to the Sanders Defendants. (Docket No. 49 at ¶ 11; Aubrey Depo.

---

[4]     Plaintiff believes that Sunrise is no longer in business, and is apparently bankrupt. (Docket No. 50, Attachments 1, at 31:8-10. Docket No. 50, Attachments 1-7, hereinafter "Aubrey Depo. at __:__").

at 297:20-25). For the services that he performed as a consultant, Dr. Sanders received stock options in Sunrise. (Docket No. 8 at 3).

Among the eleven clinical investigators hired to perform clinical trials with the Sun 1000 was Dr. Martin, the president and sole shareholder of CEA. (Docket No. 45 at ¶ 1; Docket No. 52 at ¶ 5). Dr. Martin only performed clinical trials using the Sun 1000; he did not perform trials on the Hyperion LTK and had no involvement with the FDA approval of that system. (Docket No. 45 at ¶17). In total, the clinical studies submitted to the FDA by Sunrise focused on 612 eyes; Dr. Martin conducted clinical studies using the Sun 1000 laser on approximately fifteen patients, for a total of twenty-five eyes. (Docket No. 45 at ¶¶ 2-3). CEA technicians submitted Dr. Martin's data directly to Bio-Reg, which compiled the information and supplied it to Sunrise for presentation to the FDA. (*Id.* at ¶¶ 5-6). For his participation in the clinical trials and for a cash investment in Sunrise, Dr. Martin received a number of stock options, some of which he exercised; Dr. Martin did not receive shares of stock as compensation. (*Id.* at ¶¶ 9-10).[5]

Aubrey made his first purchase of Sunrise stock in 1999, based on the recommendation of an unknown stockbroker he met at a restaurant in Palm Beach, Florida, in the summer of 1999, and the advice of another broker he met at a securities convention in Arizona in September or

---

[5]
     In early 1999, Dr. Martin converted a number of notes to Sunrise into shares of Sunrise stock. Specifically, on February 2, 1999, Dr. Martin converted a note into 183,333 shares at $3.00 a share, and, on February 5, 1999, three separate notes were converted into a total of 191,432 shares, also at $3.00 per share. (Docket No. 58-2 at 13). Thereafter, Dr. Martin sold 26,000 shares of Sunrise stock in April of 1999. (*Id.* at 3). Subsequently, on May 25, 1999, Dr. Martin exercised his stock warrants and purchased 200,000 shares at $3.00 per share; he also sold 94,500 shares in May of 1999. (*Id.* at 3,13). During 1999, Dr. Martin also purchased 3,050 shares for each of his four children. (*Id.* at 13).

October of that same year. (Docket No. 49 at ¶ 21). On July 22, 1999, Sunrise presented the data from all the clinical studies on the Sun 1000 to the FDA Opthalmologic Device Panel ("ODP") for approval. (Docket No. 45 at ¶ 12; Docket No. 49 at ¶ 16). Dr. Sanders assisted in presenting the data to the FDA; Dr. Martin was neither present at the ODP hearing nor did he make any presentation of data to the FDA. (Docket No. 49 at ¶ 11; Docket No. 45 at ¶¶ 7, 14). At this time, the FDA disapproved the Sun 1000. (Docket No. 45 at ¶ 13; Docket No. 49 at ¶ 17). The value of Sunrise stock dropped after the ODP hearing. (Docket No. 8 at 7).[6]

In January of 2000, six months after the FDA's denial of approval for the Sun 1000, Sunrise agreed to modify the laser's label to show that its impact in correcting farsightedness was only temporary and resubmitted its data to the FDA. (Docket No. 45 at ¶ 15; Docket No. 49 at ¶ 18). The laser was ultimately approved by the FDA on July 30, 2000; however, it differed slightly from the Sun 1000, and was known as the "Hyperion LTK."[7] (Docket No. 45 at ¶ 16; Docket No. 49 at ¶ 18). Aubrey continued to invest in Sunrise, buying and selling shares between 1999 and 2002. (Docket No. 49 at ¶ 31). Aubrey makes claims against Defendants for fraudulent misrepresentation and conspiracy related to the work Defendants performed to assist Sunrise in obtaining approval from the FDA for the Sunrise technology. (Docket No. 49 at ¶ 5).

---

[6]
      Sometime in July of 1999, Dr. Martin sold 70,000 shares of his stock in Sunrise. (Docket No. 58-2 at 3). Thereafter, in December of 1999, Dr. Martin purchased 500 shares at $11.66 each; 500 shares at $11.78 each; and 2,340 shares at $11.78 each, which were held in Dr. Martin's 401k account.(*Id.* at 13). He also sold 35,000 shares in December of 1999. (*Id.* at 3).

[7]
      During 2000, Dr. Martin purchased 8,500 shares in his wife's name, which he also sold in 2000. (Docket No. 58-2 at 14). Dr. Martin also sold 25,000 shares, as well as 2,500 additional shares that were held in his 401k account in the year 2000. (*Id.* at 3).

## III.    PROCEDURAL HISTORY

Plaintiff commenced the instant action by filing a Praecipe for Writ of Summons on June 23, 2004, in the Court of Common Pleas of Butler County. (Docket No. 1). Plaintiff subsequently filed a Complaint in that court on January 4, 2007. The matter was then removed to this Court pursuant to 28 U.S.C. §1441, *et seq.* on February 1, 2007, and was assigned to Judge Thomas M. Hardiman. (Docket No.1). The Sanders Defendants filed an Answer to the Complaint on February 9, 2007. (Docket No. 8). The Martin Defendants filed Answers on February 5, 2007, (Docket Nos. 3, 4), and Amended Answers on February 16, 2007. (Docket Nos. 11, 12 ). The case was reassigned to Judge Nora Barry Fischer on April 6, 2007. Discovery, including depositions of all parties, took place.

Thereafter, Dr. Martin and CEA filed a Motion for Summary Judgment on February 29, 2008, (Docket No. 44), along with a Concise Statement of Material Fact (Docket No. 45), and Brief in Support of their Motion (Docket No. 46). Similarly, Dr. Sanders and CCR also filed a Motion for Summary Judgment on February 29, 2008, (Docket No. 47) accompanied by their Concise Statement of Material Fact (Docket No.49), and Brief in Support of their Motion (Docket No. 48). On April 15, 2008, Plaintiff filed a Counter Statement of Facts and Brief in Support of Denying Defendants' Motions for Summary Judgment. (Docket No. 52). Subsequently, on April 30, 2008, the Martin Defendants filed a Responsive Concise Statement of Facts to Plaintiff's Counter Statement of Facts (Docket No. 56), as well as a Reply to Plaintiff's Response to Defendants' Motions for Summary Judgment (Docket No 58). Similarly, on April 30, 2008, the Sanders Defendants filed a Response to Plaintiff's Counter Statement of Facts (Docket No. 59),

as well as a Reply in Support of their Motion for Summary Judgment. (Docket No. 60).

## IV.    STANDARD

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Woodside v. School Dist. of Philadelphia Bd. of Educ.*, 248 F.3d 474, 477 (3d Cir. 2001) (citations omitted).  Pursuant to Rule 56, the Court must enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986).

In evaluating the evidence, the Court must interpret facts in the light most favorable to the non-moving party, and draw all reasonable inferences in their favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).  Initially, the burden is on the moving party to demonstrate that the evidence in the record creates no genuine issue of material fact. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004).  If the moving party has carried this burden, the burden shifts to the non-moving party, who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993).  In determining

whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 249 (3d Cir. 2005).

The Sanders Defendants have moved for summary judgment on Count I (fraudulent misrepresentation against Dr. Sanders), Count II (fraudulent misrepresentation against CCR), and Count V (civil conspiracy against all Defendants) of the Complaint. (Docket No. 47 at 1). Similarly, the Martin Defendants have requested summary judgment as to Count III (fraudulent misrepresentation against Dr. Martin), Count IV (fraudulent misrepresentation against CEA), and Count V (civil conspiracy against all Defendants) of the Complaint. (Docket No. 44 at 1). As discussed below, this Court finds no disputed issue of material fact, and accordingly, the Motions for Summary Judgment by the Sanders Defendants and by the Martin Defendants are granted.

## V.    ANALYSIS

As a threshold matter, this Court has jurisdiction in this case through diversity of citizenship. *See* 28 U.S.C. § 1332 (2005). A federal court sitting in diversity must apply the substantive law of the state in which it sits, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), including its choice of law rules, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). However, here, there does not appear to be any dispute between the parties that Pennsylvania law applies to this case, and thus the Court declines to engage in a choice of law analysis. *Rochez Bros., Inc. v. North American Salt Co., Inc.*, Civ. A. No. 94-1131, 1994 WL 735932, at *6 n.8 (W.D. Pa. 1994) (citing *Schiavone Construction Co. v. Time, Inc.*, 735 F.2d 94, 96 (3d Cir. 1984))

("Because the parties appear to implicitly agree on the applicable choice of law, this Court will not challenge their decision.").

### A.    FRAUDULENT MISREPRESENTATION UNDER PENNSYLVANIA LAW

Plaintiff claims that as a result of the Defendants' alleged fraudulent misrepresentations and/or omissions to the FDA and investors like him, he lost hundreds of thousands of dollars that he had invested in Sunrise.[8]  Under Pennsylvania common law, in order to establish a cause of

---

[8]

    Aubrey also claims damages in the amount of $675,000.00 incurred from the purchase of one Hyperion LTK laser and the lease of two other Hyperion lasers, which he claims proved to be ineffective instruments. (Docket No. 1-2 at ¶¶ 38-42).  Discovery has revealed, however, that the Hyperion lasers were purchased, not by Aubrey personally, but instead by two limited liability companies ("LLC"), LTK Northeast and Lasers for Ophthalmology, in which Aubrey was a member. (Aubrey Depo. at 9:11; 51:13-17).

    Under Pennsylvania law, standing to sue on behalf of an LLC is governed by statute. The relevant provision, 15 PA.C.S.A. § 8992, provides as follows:

> Suit on behalf of a limited liability company may be brought *in the name of the company* by:
>
> > (1) Any member of the company, whether or not the certificate of organization vests management of the company in one or more managers, who is duly authorized to sue by the vote of members entitled to vote who do not have an interest in the outcome of the suit that is adverse to the interest of the company.
> >
> > (2) Any manager of the company, if the certificate of organization vests management of the company in one or more managers, who is duly authorized to do so by the vote of managers who do not have an interest in the outcome of the suit that is adverse to the interest of the company.

15 PA.C.S.A. § 8992 (2008) (emphasis added). Since Aubrey instituted this lawsuit as an individual and not  in the name of either LLC, he may not sue for damages incurred by either LLC from the purchase or lease of the Hyperion LTK lasers.

action for fraudulent misrepresentation, a plaintiff must prove the following, by clear and convincing evidence:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury proximately caused by the reliance.

*Porreco v. Porreco*, 571 Pa. 61, 69, 811 A.2d 566, 570 - 571 (2002), (citing *Bortz v. Noon*, 556 Pa. 489, 499, 729 A.2d 555, 560 (1999); *Gibbs v. Ernst*, 538 Pa. 193, 207, 647 A.2d 882, 889 (1994)).  "[T]he concealment of a material fact can amount to a culpable misrepresentation no less than does an intentional false statement." *Rohm & Haas Co. v. Cont'l Cas. Co.*, 566 Pa. 464, 477 (Pa. 2001)(*quoting Moser v. DeSetta*, 589 A.2d 679, 682 (Pa. 1991)).  However, while concealment may constitute fraud, "mere silence is not sufficient in the absence of a duty to speak."  *Wilson v. Donegal Mut. Ins. Co.*, 598 A.2d 1310, 1315 (Pa. Super. Ct. 1991).  Under Pennsylvania law, a duty to disclose generally "does not arise without a confidential or fiduciary relationship between the parties . . .." *Peerless Wall & Window Coverings, Inc. v. Synchronics*, Inc., 85 F. Supp. 2d 519, 532 (W.D. Pa. 2000).

The party alleging fraud has the burden of proving each element of the claim by clear and convincing evidence.  *Moser*, A.2d at 682.  Accordingly, in considering a motion for summary judgment, "there is no genuine issue if the evidence presented . . . is of insufficient caliber or quantity to allow a rational finder of fact" to find the elements of fraud by clear and convincing evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

<u>1. Misrepresentation Claims Against Dr. Sanders and CCR</u>

-11-

In the Complaint, Aubrey's allegations of fraudulent misrepresentation against Dr. Sanders and CCR are two-fold. First, Aubrey alleges that Dr. Sanders made fraudulent misrepresentations to the FDA by submitting manipulated clinical data (*i.e.*, data that did not include the results of unsuccessful clinical trials) to the ODP for the purpose of obtaining FDA approval of the Sun 1000 and the Hyperion LTK.[9] (Docket No. 1-2 at ¶¶ 20-21, 35). Second, Aubrey asserts that Dr. Sanders made statements to the public regarding Sunrise stock via press releases and articles for the purpose of misleading investors, including him. (Docket No. 1-2 at ¶ 24). Aubrey specifically contends that Dr. Sanders knew that the ODP Board and the FDA would not approve the Sun 1000, and despite having this knowledge, failed to release this information to existing and potential investors, knowing that releasing such information would have a detrimental effect on the value of Sunrise stock. (Docket No. 52 at 4).

a. *Sanders Defendants' Alleged Misrepresentations*

Aubrey has failed to identify a single representation or statement made by the Sanders

---

[9]

To the extent that Aubrey's claims against the Sanders Defendants are based on the alleged misrepresentation of data to the FDA, such claims are preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S. C. S. §§ 301 *et seq. See Buckman Co. v. Plaintiff's Legal Committee*, 531 U.S. 341, 343 (2001).

In *Buckman*, the plaintiff brought a personal injury action against the manufacturer of bone screws which had allegedly caused injury to the plaintiff. *Buckman*, 531 U.S. at 343. The claim was based on allegations that the manufacturer had provided misleading information to the FDA to gain approval for the use of the screws in orthopedic surgery. *Id*. The Supreme Court held that the plaintiff's "fraud on the FDA" claims were preempted by the Food, Drug, and Cosmetic Act, stating that "the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration." *Id*. at 348. Thus, to the extent that Aubrey's claims for misrepresentation against the all Defendants are based on allegations that Dr. Sanders and Dr. Martin made fraudulent misrepresentations to the FDA, these claims are preempted by the FDCA.

Defendants on which he relied in purchasing Sunrise stock. (Docket No. 49 at ¶ 22). While the Plaintiff has produced Sunrise promotional materials and news articles obtained from the Internet, some of which purport to contain quotes by Dr. Sanders, Aubrey admits that he believes the first time he saw these materials was when he began preparing for the instant litigation, making it impossible that he relied on those statements when making the stock purchases. (*Id.* at ¶¶ 28-29). Thus, Plaintiff's "evidence" of misrepresentation amounts to mere speculation, which is far short of the evidence necessary to defeat a motion for summary judgment, especially in light of the "clear and convincing" standard that is required to prove fraud under Pennsylvania law. *See Sterling Nat'l Mortg. Co. v. Mortgage Corner*, 97 F.3d 39, 45 (3d Cir. 1996); *Moser,* 589 A.2d at 682.

b. *Sanders Defendants' Alleged Omissions*

Aubrey's claims for fraudulent misrepresentation based on omission or concealment of material facts also fail. An omission is actionable fraud only where "there is an independent duty to disclose the omitted information." *In re Estate of Evasew*, 526 Pa. 98, 103 (Pa.1990). Such a duty exists "where the party who is alleged to be under an obligation to disclose stands in a fiduciary relationship to the party seeking disclosure." *Id.* The alleged victim of fraud "must show a relationship involving trust and confidence." *Id.* Aubrey has failed to establish the existence of a fiduciary relationship between him, as an investor in Sunrise, and the Sanders Defendants, who were outside consultants hired by Sunrise for the purpose of setting up clinical trials and making a presentation to the FDA. Aubrey has cited no case law for the proposition that the Sanders Defendants had a legal duty to disclose any information to him. Nor was there ever

any direct relationship between Sanders and Aubrey prior to the commencement of this litigation.[10] (Docket No. 49 at ¶ 19). Thus, failing to establish that *any* relationship, personal or legal, existed between him and the Sanders Defendants, Aubrey is unable to establish that Dr. Sanders or CCR had a duty to disclose their findings to him.

Even if Aubrey had established that a fiduciary relationship existed between him and the Sanders Defendants, he has provided no evidence that Dr. Sanders or CCR concealed any type of information related to the clinical trials, despite having several months of discovery to do so. Specifically, Aubrey admits that Dr. Sanders did not conduct the trials or collect the data; rather, that information was collected by another company, Bio-Reg. (Docket No. 49 at ¶ 9-10). Dr. Sanders then assisted Sunrise in presenting the evidence to the FDA. (*Id.* at ¶ 11). Aubrey further admits that he has no evidence that Dr. Sanders manipulated any of the data collected by Bio-Reg. (*Id.* at ¶ 12).

### c. *Plaintiff's Alleged Reliance*

Aubrey has failed to demonstrate that he relied in any way on information about the clinical trials or any aspect of the business which would have been affected by the Sanders Defendants' alleged omissions. Aubrey admits he purchased Sunrise stock not on the basis of statements by Dr. Sanders or CCR but rather on "what everybody was saying about [the stock],"[11]

---

10

When asked how Aubrey knew Dr. Sanders, Aubrey relied that: "I don't have any relationship with him." (Aubrey Depo. at 28:3-10). Aubrey further stated that he only knew about Dr. Sanders, "through [his] research about [Dr. Sanders]." (Aubrey Depo. at 28:11-12).

11

To the extent that Aubrey's claims against the Sanders and Martin Defendants for fraudulent misrepresentation are based upon a "fraud on the market" theory of liability, such

claims fail as a matter of law. Succinctly put:

> [t]he fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986) (citations omitted).

As other courts have noted, Pennsylvania courts have not adopted a fraud on the market claim in common law securities fraud claims, and common law fraudulent misrepresentation requires proof of actual reliance by the plaintiff on misrepresentations made by the defendant. *See In re Regal Communications Corp. Sec. Litigation*, Civ. A. No. 94-179, 1997 WL 411654, at *5 (E.D.Pa. July 17, 1996). Some district courts in this Circuit have predicted that the Pennsylvania Supreme Court will adopt the fraud on the market theory for common law securities fraud claims in light of *Basic, Inc. v. Levinson*, 485 U.S. 224, 249 (1988). *See, e.g.*, *In re Atlantic Financial Federal Sec. Litigation*, Civ. A. No. 89-0645, 1990 WL 171191, at *2-3 (E.D.Pa. Oct. 31, 1990). In *Basic*, the U.S. Supreme Court held that plaintiffs in 10b-5 actions did not have to demonstrate direct reliance on a misrepresentation; rather, investors' reliance on an alleged misrepresentation is presumed if the company's shares were traded on an efficient market. *Basic,* 485 U.S. at 248-49.

The Court finds the reasoning of the aforementioned district court cases unpersuasive as applied to the facts of this case. As the Supreme Court noted in *Basic*, "[a]ctions under Rule 10b-5 are distinct from common-law deceit and misrepresentation claims and are in part designed to add to the protections provided investors by the common law." 485 U.S. at 244, n.22. This is an important distinction, and other federal courts have refused to apply the fraud on the market theory to state common law claims. *See, e.g., Securities Investor Protection Corp. v. BDO Seidman, LLP,* 222 F.3d 63, 73 (2d Cir. 2000).

Furthermore, even if the Pennsylvania Supreme Court were to adopt the fraud on the market theory to common law securities fraud claims, Plaintiff's claims are distinguishable from the cases where this theory has been applied. District courts that have applied this theory have done so in the context of class action securities fraud litigation where investors brought suit against the company in which they had invested. See *Hemispherx Biopharma, Inc. v. Asensio and Asensio & Co., Inc., et al*, No. 98-5204, 1999 U.S. Dist. LEXIS 2849

and, more specifically, upon the advice of Lehman Brothers. (*Id.* at ¶ 26, 31). Aubrey admits that he "knew nothing about [the Sunrise laser] back [when he was buying stock in 2000]" and stated that he decided to invest in Sunrise based upon the advice of Lehman Brothers. (*Id.* at ¶ 30-31). Aubrey admits that he bought and sold Sunrise stock between 1999 and 2002 based on Lehman's advice.[12] (*Id.* at ¶ 34). Thus, Plaintiff has failed to provide any evidence that he relied on the Sanders Defendants' alleged misrepresentations or omissions when purchasing Sunrise stock.

Plaintiff has failed to establish two of the necessary elements of his claim: misrepresentation and reliance. Thus, based upon the undisputed facts, as well as Plaintiff's failure to present any evidence that would create a triable issue of fact, the Court grants the Sanders Defendants' Motion for Summary Judgment on the fraudulent misrepresentation claims (Counts I, II).

### 2. Misrepresentation Claims Against Dr. Martin and CEA

In his Complaint, Aubrey claims that Dr. Martin made fraudulent misrepresentations to

---

(E.D.Pa. March 15, 1999); *Regal,* 1996 WL 411654 at *33; *In re Healthcare Sevices Group, Inc. Sec. Litigation*, No. 91-6097, 1993 WL 54437 (E.D.Pa. March 1, 1993); *Atlantic,* 1990 WL 171191 at *3. In those cases, defendant companies had a duty to disclose the information in question to their investors. In contrast, Aubrey is bringing claims not against the company in which he invested, Sunrise, but against a group of Defendants who were not officers, directors, or even employees of the corporation. Moreover, the fraud on the market theory is best suited for class action litigation where it would be almost impossible for each plaintiff to show that he relied on the integrity of the market.

[12]

Aubrey further admits that he brought an arbitration claim against Lehman Brothers, in which he alleged that he relied on the advice of Lehman Brothers when he purchased and sold Sunrise stock. (Docket No. 49 at ¶ 32). He maintains that his allegations in the action against Lehman Brothers were true, reaffirming that his purchases and sales of Sunrise stock were based on what Lehman's advice.( *Id.* at ¶ 33).

investors (including the Plaintiff) and the FDA[13] regarding the efficacy of the Sun 1000 and the results of the clinical trials performed by Dr. Martin in the U.S. and the Dominican Republic.[14] (Docket No. 1-2 at ¶¶ 59-85). For the same reasons that the Court determined that Aubrey failed to establish a claim for misrepresentation against the Sanders Defendants, the Court finds that Aubrey also fails to establish such a claim against the Martin Defendants.

### a. *Martin Defendants' Alleged Representations*

Aubrey cannot point to any statement made by the Martin Defendants on which he relied in purchasing Sunrise stock. In his deposition, Plaintiff could not identify any quotes or publications by Martin on which he relied. (Aubrey Depo. at 77:19 - 78:5-7). The only evidence Aubrey has produced in support of his fraudulent misrepresentation claims is a copy of a page from the CEA website that notes Dr. Martin's use of Sunrise technology.[15] (*Id.* at 197:1 - 200:2). In fact, Plaintiff admits that Dr. Martin never encouraged anyone, including the Plaintiff, to invest in Sunrise. (Docket No. 45 at ¶ 19). Rather, Aubrey invested in Sunrise based on "what everybody was saying about [the stock]," and, more specifically, upon the advice of Lehman

---

[13]

To the extent that Aubrey's claims against the Martin Defendants are based on the alleged misrepresentation of data to the FDA, such claims are preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C.S. §§ 301 *et seq. See* discussion, *supra.* note 9.

[14]

Plaintiff has since admitted that Dr. Martin was not aware of any trials being conducted in the Dominican Republic. (Docket No. 45 at ¶ 8).

[15]

Notably, Aubrey cannot even recall when he first saw the website (Aubrey Depo. at 197:13-16).

Brothers. (*Id.* at ¶ 26, 31). As with the Plaintiff's allegations against Dr. Sanders, the only "evidence" of misrepresentation Plaintiff has produced against the Martin Defendants amounts to mere speculation, which is far short of the evidence necessary to defeat a motion for summary judgment. *See Sterling*, 97 F.3d at 45; *Moser*, 589 A.2d at 682.

b. *Martin Defendants' Alleged Omissions*

Plaintiff's claims for fraudulent misrepresentation based on omission or concealment of material facts also fail. As previously noted, an omission is actionable fraud only where "there is an independent duty to disclose the omitted information." *In re Estate of Evasew*, 526 Pa. 98, 103 (Pa.1990). As with his claims against Dr. Sanders, Aubrey has failed to establish the existence of a fiduciary relationship between him, as an investor in Sunrise, and the Martin Defendants, who were outside consultants hired by Sunrise for the purpose of conducting a small percentage of clinical trials of the Sun 1000.[16] Aubrey has cited no case law for the proposition that the Martin Defendants had a legal duty to disclose any information about their trials to him or any other investor. Nor was there ever any direct relationship between Aubrey and Martin prior to the commencement of this litigation. (Docket No. 45 at ¶ 18). Having failed to establish that *any* relationship, personal or legal, existed between him and the Martin Defendants, Aubrey is unable to establish that Dr. Martin and CEA had a duty to disclose information about their trials. Even if Aubrey had established that a fiduciary relationship existed between him and the Martin Defendants, he has provided no evidence that Dr. Martin or CEA concealed any type of

---

[16]
Aubrey admits that Dr. Martin conducted less than 5% of the clinical trials submitted to the FDA. (Docket No. 45 at ¶¶ 2-3).

information related to their clinical trials.

### c. *Plaintiff's Alleged Reliance*

Aubrey has failed to demonstrate that he relied in any way on information about Martin's clinical trials. Aubrey admits that he "knew nothing about [the Sunrise laser] back then [when he was buying stock in 2000]" and stated that he decided to invest in Sunrise based upon the advice of Lehman Brothers. (Docket No. 49 at ¶ 30-31). Aubrey admits that he bought and sold Sunrise stock between 1999 and 2002 based on Lehman's advice.[17] (*Id.* at ¶ 34). When specifically asked whether Dr. Martin had ever encouraged him personally to invest in Sunrise, Aubrey answered in the negative. (Aubrey Depo. at 77:11-14). Thus, Plaintiff has failed to provide any evidence that he relied on the Martin Defendants' alleged misrepresentations or omissions when purchasing Sunrise stock.

In his claim for fraudulent misrepresentation against the Martin Defendants, Aubrey has failed to establish the necessary elements of misrepresentation and reliance. Thus, based upon the undisputed facts, as well as the Plaintiff's failure to present evidence that would create a triable issue of fact, the Court grants the Martin Defendants' Motion for Summary Judgment on the Plaintiff's fraudulent misrepresentation claims (Counts III, IV).

### B. CIVIL CONSPIRACY UNDER PENNSYLVANIA LAW

Plaintiff alleges that the Defendants conspired to conceal negative information about the trials in order to preserve the value of their stock holdings. (Docket No. 52 at 4). In order to maintain an action for civil conspiracy under Pennsylvania law, Aubrey must allege and prove the

---

[17]

*See supra.,* note 12.

following elements: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual damage. *Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa. Super. 2004). "Absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." *Goldstein*, 854 A.2d at 590. Because the Court has concluded that Aubrey cannot establish claims for fraudulent misrepresentation against either the Sanders Defendants or the Martin Defendants, Aubrey's claim for civil conspiracy to commit fraudulent misrepresentation also fails. Even if the Court had found a basis for Aubrey's fraudulent misrepresentation claims, his claim for civil conspiracy would still be without merit because Aubrey has not set forth any evidence of an agreement between the Sanders Defendants and the Martin Defendants to misrepresent information to Aubrey, either personally or as an investor in Sunrise.[18] Accordingly, the Court grants Defendants' Motions for Summary Judgment on the Plaintiff's civil conspiracy claims (Count V).

## VI.     CONCLUSION

A party who alleges fraud bears the burden of proving the claim by clear and convincing evidence. *Moser,* 589 A.2d at 682. Even viewed in a light most favorable to Plaintiff, this Court finds that the sparse evidence presented by the Plaintiff "is of insufficient caliber [and] quantity

---

[18]     Aubrey testified that he did not have any documents that reflect a secret or tacit agreement between Dr. Sanders and Dr. Martin to act together to substantially harm the interests of purchasers and investors in Sunrise. (Aubrey Depo. at 386:17:20). Rather, Aubrey indicated that he based his allegation of conspiracy on "the past business dealings that Dr. Martin and Dr. Sanders had together," and his "thought[s] that [Dr. Martin and Dr. Sanders] were fairly inseparable." (*Id.* at 386:4-14; 387:6-7).

to allow a rational finder of fact" to find the elements of fraudulent misrepresentation by clear and convincing evidence. *Anderson*, 477 U.S. at 254. Plaintiff has failed to prove the Defendants made any representations or omissions on which he relied in making his purchases of Sunrise stock. Furthermore, there is no evidence that the Defendants acted together to defraud the Plaintiff or any other investor.

Accordingly, the Motion for Summary Judgment by Defendants Dr. Donald Sanders, M.D., and Center for Clinical Research, Inc., [47] as to Counts I, II, and V is **GRANTED**. Likewise, the Motion for Summary Judgment by Defendants Robert Gale Martin, M.D., and Carolina Eye Associates, P.C., [44] as to Counts III, IV, and V is **GRANTED**. An appropriate order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

September 26, 2008
cc/ecf: All Counsel of Record.